had a right to stop that, and compel the prior application of Patton's collateral.

It follows that the judgment should be reversed and a new trial granted, with costs to the appellant to abide the event. All concur; KELLOGG, J., in memorandum.

JOHN M. KELLOGG, J. I concur in all Justice HOUGHTON says, except with reference to the answer. I am satisfied the answer does not present the issue litigated. The complaint alleges the turning over to the defendant bank of certain securities and property to secure the so-called $15,000 note, that there was no authority to pledge it for other purposes, but that the bank claims to hold it for other indebtedness of Patton, that the bank had realized more than enough to pay the indebtedness intended to be secured, and had refused to return or account for the securities, and it prayed an accounting and that the plaintiff's interest in the property pledged be fixed.

The answer contains several denials, alleges that the collateral was intended to secure the so-called $11,000 note, and that there is $577.24 unpaid upon it, and that the defendant has the right to retain the collateral until such loan is paid. It then alleges that the defendant served upon the plaintiff a certain notice, a copy of which is attached to the answer, but which apparently is of no force as a pleading. The statements in the notice are not even alleged to be true. Apparently from the face of the pleadings the plaintiff would be entitled to the return of the securities mentioned in the complaint upon payment of the $577.24. In an action for an accounting, if the defendant held the security for other indebtedness, it was its duty to allege the facts. I think the alleged notice does not help out the answer, and that there is an absence of any allegations which justify the proof of other indebtedness for which the defendant claims to hold the collateral.

---

BROOKLYN HEIGHTS R. CO. v. BROOKLYN CITY R. CO.

(Supreme Court, Appellate Division, Second Department.   June 7, 1912.)

1. CORPORATIONS (§ 318*)—OFFICERS—CONFLICTING INTERESTS.

Where the material interests of two corporations as lessor and lessee conflict, it is improper for persons interested in one to obtain active control and management of the other, regardless of the existence of actual fraud.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1363, 1364; Dec. Dig. § 318.*]

2. CORPORATIONS (§ 426*)—DIRECTORS' ACTS—RATIFICATION.

Stockholders can ratify acts of directors which they or the corporation might avoid, but the ratification must be based on knowledge of the situation or retention of benefits.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1596, 1702–1704, 1708, 1710–1716; Dec. Dig. § 426.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. CORPORATIONS (§ 432*)—DIRECTORS' ACTS—RATIFICATION—EVIDENCE—SUF-
FICIENCY.

Evidence *held* insufficient to show that the stockholders of a street
railway company ratified a transaction, as to which directors were dis-
qualified on account of adverse interests in another company.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1717, 1718,
1724, 1726–1737, 1743, 1762; Dec. Dig. § 432.*]

4. CORPORATIONS (§ 426*)—DIRECTORS' ACTS—RATIFICATION.

Illegal acts by the directors of a corporation, which holds the stock
of another company, regarding such stock, require ratification in the
same manner as is required in the case of illegal acts concerning other
property.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1596, 1702–
1704, 1708, 1710–1716; Dec. Dig. § 426.*]

5. CORPORATIONS (§ 432*)—DIRECTORS' ACTS—RATIFICATION.

Ratification by stockholders of voidable acts of directors may be in-
ferred from circumstances, if no public interest is involved.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1717, 1718,
1724, 1726–1737, 1743, 1762; Dec. Dig. § 432.*]

6. ACCORD AND SATISFACTION (§ 1*)—TRANSACTIONS CONSTITUTING.

There was no accord and satisfaction under an agreement between
plaintiff and defendant electric railways for an adjustment of rights un-
der a lease, where there was no full accounting and defendant owed
plaintiff more than a million dollars; the agreement not purporting to
finally determine the accounts between the parties.

[Ed. Note.—For other cases, see Accord and Satisfaction, Cent. Dig. §§
1–13; Dec. Dig. § 1.*]

7. ACCORD AND SATISFACTION (§§ 16, 5, 1*)—ESSENTIALS.

To constitute an accord and satisfaction, there must be a good con-
sideration for and execution of the agreement, intention to settle claims
admitted or in dispute, and mutuality of binding force.

[Ed. Note.—For other cases, see Accord and Satisfaction, Cent. Dig. §§
116–122, 40–45, 1–13; Dec. Dig. §§ 16, 5, 1.*

For other definitions, see Words and Phrases, vol. 1, pp. 81–84; vol. 8,
p. 7561.]

8. CONTRACTS (§§ 335, 344*)—ACTION ON CONTRACT—PROOF REQUIRED.

Where a party relies on an executory contract to support a cause of
action or defense, or relies on an excuse for nonfulfillment, fulfillment
or the excuse must be pleaded and proved.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1664–1676, 1693,
1694; Dec. Dig. §§ 335, 344.*]

9. PLEADING (§ 165*)—REPLY—NECESSITY.

The matter set up by defendant by way of defense and avoidance is
deemed controverted by the plaintiff without affirmative pleading.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 321, 327, 328;
Dec. Dig. § 165.*]

10. STREET RAILROADS (§ 57*)—MORTGAGE—PROPERTY COVERED—EVIDENCE.

In an action by a lessee street railway to recover money which defend-
ant lessor agreed to furnish to convert the road into an electric line, evi-
dence *held* to show that the cause of action was not included in a fore-
closed mortgage given by plaintiff.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 136–143;
Dec. Dig. § 57.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

11. ACCORD AND SATISFACTION (§ 20*)—MOTIVE.
An agreement does not operate as an accord and satisfaction if there was fraud or a mutual mistake as to indebtedness recited in the agreement.
[Ed. Note.—For other cases, see Accord and Satisfaction, Cent. Dig. §§ 140–142; Dec. Dig. § 20.*]

12. STREET RAILROADS (§ 49*)—LEASES—ADVANCES—DEMAND—NECESSITY.
Demand for advance of money by a leasing street railroad company to enable the lessee to convert the road into an electric road as provided for by the lease was unnecessary, where the lessee was controlled by officers who were acting for the lessor and whose interests were adverse to the lessees, and where demand would have been unavailing.
[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. § 49.*]

13. EVIDENCE (§ 265*)—ADMISSIONS—CONCLUSIVENESS.
An admission by defendant that a demand was made by plaintiff concludes defendant, though a referee finds no demand was made; that finding being properly disregarded as being immaterial.
[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1029–1050; Dec. Dig. § 265.*]

14. TRIAL (§ 388*)—FINDINGS—ADMITTED MATTERS.
Admissions in pleadings need not be made part of the findings.
[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 908–911, 915; Dec. Dig. § 388.*]

15. REFERENCE (§ 99*)—FINDINGS—MATTERS NOT REFERRED.
A referee's findings on matters not referred to him are without force.
[Ed. Note.—For other cases, see Reference, Cent. Dig. §§ 148–156; Dec. Dig. § 99.*]

16. STREET RAILROADS (§ 57*)—LEASES—ACTION BY LESSEE—EVIDENCE—SUFFICIENCY.
In an action by a lessee street railroad company to recover money which defendant lessor agreed to furnish to convert the road into an electric line, evidence *held* to warrant a finding that it was not understood that defendant should receive credit for moneys expended before the agreement became effective.
[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 136–143; Dec. Dig. § 57.*]

17. INTEREST (§ 19*)—RIGHT TO—UNLIQUIDATED DEMANDS.
The common-law rule that interest is not allowable on an unliquidated claim has been modified only to the extent of including claims ascertainable as to amount by mere computation.
[Ed. Note.—For other cases, see Interest, Cent. Dig. §§ 35–40; Dec. Dig. § 19.*]

18. INTEREST (§ 67*)—UNLIQUIDATED CLAIMS—SUFFICIENCY.
Evidence *held* to show that plaintiff's claim was unliquidated, making an award of interest improper
[Ed. Note.—For other cases, see Interest, Cent. Dig. §§ 155, 156; Dec. Dig. § 67.*]

Appeal from Trial Term, Kings County.

Action by the Brooklyn Heights Railroad Company against the Brooklyn City Railroad Company. Judgment for plaintiff, and defendant appeals. Modified and affirmed.

See, also, 145 App. Div. 933, 129 N. Y. Supp. 1114.

For many years from February, 1893, the defendant had been engaged in the successful operation of street surface railroads in the city of Brooklyn,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

N. Y. At that time, and while engaged in converting the roads into an electric system, it entered into an agreement to lease its roads to the plaintiff, a corporation organized under the laws of the state of New York, with a capital stock of $200,000, a bonded indebtedness of $250,000, the owner of a railroad about one-half mile in length, for the term of 999 years. The lease was delivered pursuant to agreement April 17, 1893, conditioned among other things that: "The rental equal to ten per cent. net per annum on the capital stock of the lessor, as hereinbefore provided, shall be paid quarterly on the first day of July, October, January and April, in each and every year. The rental equal to the interest on the bonded indebtedness of the lessor on bonds issued or assumed by it shall be paid by the lessee to the lessor from time to time at least five days before the semiannual interest shall become due and payable by the terms of said bonds respectively. The lessee also covenants and agrees to pay to the lessor during the term herein demised as rental the interest on all bonds at any time hereafter outstanding issued by the lessor, not in excess of $6,925,000, either in renewal or extension of or for the purpose of the redemption, payment or discharge of the said bonds issued or assumed by said lessor, and to make such payment to the lessor at least five days before the semiannual interest shall by the terms of said bonds respectively become due and payable. For all of the aforesaid payments well and truly to be made during the term by this lease demised, the said lessee hereby binds itself and its successor or successors firmly by these presents."

"The lessee further covenants and agrees· that it shall not have the right to and will not make or construct any extensions, additions, branches and improvements or furnish any equipments to the said railroad and railroads and properties by this lease demised to be paid for out of its own funds other than such as shall be necessary to keep said railroads and properties in good condition and repair, and to preserve efficiency in the operation of said railroad until after the said unissued stock and bonds of the lessor shall have been issued and the proceeds realized upon the sale of said stock and bonds shall have been expended as in this lease provided, and that it will not construct or apply for the right to construct any extension or branch of said railroad or railroads without first obtaining the consent in writing of the lessor thereto. The lessee further covenants and agrees that it will proceed faithfully and diligently with the work of converting the said railroad and railroads into an electric railroad, or into such other kind of railroad as shall be approved by the lessor and lessee; and that in the event that the said moneys belonging to the lessor, on hand at the date this lease takes effect, after the deductions aforesaid and the proceeds of said stock and bonds of said lessor authorized to be issued, but unissued, shall be insufficient to pay and discharge the cost of converting the said railroad and railroads of the lessor into an electric railroad, or into such other kind of railroad as may be agreed upon by the lessor and lessee, that then and in that event the lessee will forthwith furnish and supply all such sums of money, materials and supplies as may be requisite and necessary for that purpose, and will proceed faithfully and diligently with the work of constructing and converting said railroad and railroads into an electric road or such other kind of railroad as may be agreed upon by the lessor and lessee. * * * The lessee further covenants and agrees to deposit or cause to be deposited in the Brooklyn Trust Company, or such company or companies, as trustee, as may be designated by the lessor, on the date of the delivery of this lease and prior to the date of delivery of possession thereunder, the sum of four million dollars ($4,000,000) as a guaranty and security for the performance by it of each and every covenant contained in this lease on its part to be kept and performed, which sum of four million dollars ($4,000,000) shall be invested in Brooklyn City or New York City, or United States government bonds, or in such other securities and mortgages as shall be approved by the lessor and the lessee, all of which securities and mortgages shall be deposited with the said trustee or trustees."

"It is mutually covenanted and agreed between the lessor and lessee that this lease shall not be binding or valid as to either of the parties hereto until approved by' the vote of the stockholders of the lessor and lessee as re-

quired by law, and that if so approved, this lease shall be delivered to the lessee at such time and upon such terms and conditions as shall be agreed upon by the boards of directors of said lessor and lessee, but notwithstanding such approval and delivery, this lease shall not go into effect nor shall the lessee be entitled to enter into possession of the premises and property by this lease demised until said four million ($4,000,000) shall have been actually deposited either in cash or in securities, or both, pursuant to the terms of this lease, with said Brooklyn Trust Company or companies designated by said lessor and lessee, nor until a certificate of said Brooklyn Trust Company or such companies to that effect is indorsed hereon or attached hereto, which certificate shall be duly executed by said Trust Company or companies under its or their corporate seals, and shall state that said four million dollars ($4,000.000), or such portion thereof as they respectively hold, is held upon the trusts and subject to the terms, covenants and stipulations and conditions in this lease contained with respect thereto."

On the 7th day of March, 1893, the Long Island Traction Company was incorporated under the laws of the state of Virginia, with an authorized capital of $30,000,000, with power to own and hold the capital stock of other corporations. On April 6, 1893, James Lawrence, representing a syndicate, made an offer in writing to the Long Island Traction Company that he would purchase the entire $30,000,000 of capital stock of the Long Island Traction Company by paying the $4,000,000 in cash to form the proposed guaranty fund under the lease, such payment to be made simultaneously with the delivery of possession of the leased property, and by transferring to the Long Island Traction Company the entire capital stock of the plaintiff of the par value of $200.000, and by procuring an agreement to be made between the Long Island Traction Company and plaintiff to the effect that all the net earnings of the plaintiff after paying 10 per cent. upon its capital stock should belong to the Long Island Traction Company, and that he would pay to the plaintiff so much as might remain out of a fund of $500,000 after paying expenses of incorporation and other miscellaneous expenses. An agreement was subsequently executed and delivered between the Long Island Traction Company and the plaintiff, which provided that the Long Island Traction Company should deposit the $4,000,000 guaranty fund provided by the lease, and that if at any time such $4,000,000 fund should no longer be subject to the terms of the lease, then it should be paid over to the Long Island Traction Company. On June 6, 1893, evidence was furnished to plaintiff and defendant that said $4,000,000 guaranty fund had been deposited as provided by the lease, and on the same date the plaintiff entered into possession of the demised property. From the time when the agreement was executed to the date of the delivery of the possession of the roads to the plaintiff, the work of conversion was carried on by the defendant and was afterwards continued by the plaintiff.

By article 5 of the lease the defendant agreed "to issue $3,000,000 of its capital stock now unissued, but authorized to be issued, within six months after the delivery of this lease; and to sell and dispose of the same at par, and also to issue $3,000,000 of its bonds, now unissued, but authorized to be issued, which said bonds shall be issued from time fo time, as requested by said lessee, and shall be sold or disposed of for the highest price bid or offered therefor, and the proceeds of said stock and bonds, less any premium realized or received on the sale of the said bonds, shall be expended by the lessor in payment, at the request of the lessee, from time to time, of the cost of converting the railroads of the lessor into an electric railroad." The said $3,000,000 of stock and the said $3,000,000 of bonds were issued subsequent to the 6th day of June and sold after the lease took effect, and the net amount of the proceeds thereof, after deducting the premium received on the bonds, was $6,000,000. The cost of conversion work done after June 6, 1893, and before October 26, 1894, by the lessee was more than $6,000,000. This action was brought to recover an alleged unexpended portion of $6,000,000, which the lessor agreed to furnish for such purpose.

In the early summer of 1894, the plaintiff was in need of a large sum of money for conversion purposes, and after some negotiations with defendant, and on the 17th of August, 1894, certain officers of the Long Island Traction

Company, of the plaintiff, and of the defendant, signed a paper known in the action as the "Tripartite Agreement." The referee finds: "That during the year 1894 there was an examination of the accounts of the plaintiff and the defendant which led up to and embraced the so-called tripartite agreement, attached to the answer of the defendant and marked 'Exhibit A.' That at the time of the execution of said tripartite agreement both corporations, the plaintiff and defendant, were controlled by substantially the same interests and set of men, and that the alleged adjustment of accounts between the companies was made from the book entries appearing upon the books of account of the plaintiff and defendant respectively, and that upon such books of account appeared and was taken into consideration moneys expended by the defendant in the construction and in converting its road into an electric railroad prior to June 6, 1893; and there also appeared upon such books, and were taken into consideration upon such accounting, many items charged to·construction which were not properly so charged, and the moneys therein set forth had not been expended for the purposes of construction or converting the railroad in question into an electric railroad, and such books of account did not exhibit a true and correct statement of accounts between the plaintiff and defendant of moneys that had been expended for the purposes of constructing and transforming the said railroad into an electric railroad."

The tripartite agreement contained the following recital: "Whereas, said Heights Company is indebted to said Brooklyn Company in large sums of money for advances made to it by said Brooklyn Company in and about conversion of said demised railroads into an electric railroad and the equipment of the same as such"—in anticipation of the sale of certain real estate and personal property of the Brooklyn Company which under the terms of the lease was to be sold and the proceeds applied to the conversion and equipment. The referee found at the request of the defendant that "the sum of $308,340.35, the amount of the promissory note provided for in the tripartite agreement, was computed between those who assumed to represent the plaintiff and the defendant." He also found that the note was without consideration, and "neither during the year 1894 nor at any other time was there an accounting and settlement between the plaintiff and defendant, nor an accord and satisfaction of the cause of action set up in the complaint herein."

Argued before JENKS, P. J., and BURR, CARR, WOODWARD, and RICH, JJ.

Charles F. Brown and Alexander B. Siegel, both of New York City, for appellant.

Edward W. Hatch, Charles A. Collin, John L. Wells, and C. A. Severance, all of New York City, for respondent.

RICH, J. The facts presented are so interesting, the arguments of counsel so elaborate, and the amount involved in this controversy so great, that we feel called upon to give full expression of our views upon the important issues involved.

If the tripartite agreement constituted an accord and satisfaction, as is so ably contended by counsel for appellant, the judgment must be reversed and this action ended. It may be well, therefore, to take up the immediate consideration of that paper.

The defendant claims that the agreement constitutes a valid binding accord and satisfaction of each and every matter upon which the plaintiff relies to support the recovery which has been had. The learned referee found that at the time of the making and execution of said agreement, and from the month of February, 1894, down to about January 14, 1896, plaintiff was controlled by a board of di-

rectors and officers, substantially all of whom were largely interested as stockholders in the defendant, and were disqualified from representing the plaintiff in any matter in which the defendant was interested; also, that the president and secretary of the plaintiff, signing said agreement on its behalf, were both largely interested in the stock of the defendant. And he found as a conclusion of law:

"That there had been no accord and satisfaction between the plaintiff and defendant of the claims, demands, and accounts of said parties by and against each other."

The defendant did not in terms plead the agreement as an accord and satisfaction in its answer, nor claim that it constituted a technical accord and satisfaction upon the trial. Its claim in this respect was that the making of the agreement, the acts done thereunder, and the entire transaction connected therewith constituted the instrument in legal effect an accord and satisfaction.

We think that the entire transaction is to be considered, and, if what was done requires the conclusion that there was a binding accord and satisfaction, the question is fairly presented, and, as the facts are pleaded, force and effect should be given thereto, even though no express language designates the tripartite agreement as an accord and satisfaction. It is upon this assumption that we consider its effect. The finding by the referee that, at the time of the execution of the tripartite agreement, the board of directors and the officers of the plaintiff were largely interested in the defendant, is abundantly sustained by the evidence, which justifies the conclusion that, at all times from the date of the lease until January, 1896, when the plaintiff came under an impartial control, the defendant exercised a controlling interest in its affairs and management. From the date of the lease in February, 1893, to the 6th day of June following, when the transfer of possession of the property took place, the defendant was in absolute control. On the last-named date, while in form a change in possession and management took place, yet it is evident that such change was scarcely more than colorable, and the defendant remained the dominating factor in control and management. This is established by the testimony of Mr. Lewis, who was at that time the president of the defendant, was a large holder of its stock, and had been identified with it since 1868. He was first elected its president in December, 1886, and served as such officer until February 21, 1894. On that day he resigned to accept the presidency of the plaintiff. In his announcement of such fact to the board of directors he stated:

"That he so acted in order to be enabled to accept the office of president of the Brooklyn Heights Railroad Company and the Long Island Traction Company; that while he certainly felt regret to resign as president and director of the Brooklyn City Railroad Company, that these institutions were so intimately connected in their interests and relations that he did not regard his resignation in the sense in which that term is ordinarily understood, but rather in the nature of a change of situation, as he would always have the interests of the Brooklyn City Railroad Company just as much at heart."

The subsequent membership of the directorate of the plaintiff, taken from the board of directors of the defendant, in large part,

shows that it was intended that the interest of the defendant should be a paramount consideration. The character of the transaction and the very large interest which the defendant had at stake easily accounts for this action. As was natural under the circumstances, Mr. Lewis continued the management of the plaintiff in practically the same offices with little change, and, as he says, he operated the railroad just the same as he had before the 6th of June, 1893. He surrounded himself with directors taken from the defendant's board. So common was this practice that, when Mr. Lewis was asked to name the members of the joint committee of the two boards of directors who were considering the plaintiff's financial necessities in 1894, he stated:

"I don't recollect distinctly without looking at the record, whether either of these gentlemen, Mr. Leggett and Mr. White, were in the Heights Company, for the reason that we took certain men out of one company and put them in the other, and made distinct boards between the Brooklyn City and Brooklyn Heights."

He made Mr. Bogardus, who had charge of the accounts of the defendant, a like accountant for the plaintiff, and for a time he was made general manager, and was also secretary and assistant treasurer and treasurer of the plaintiff, and much of the time acted for both companies. Mr. Swin, who had been assistant secretary and secretary of the defendant, was in 1893 elected assistant secretary and treasurer of the plaintiff, and he continued to act in such capacity until April, 1894. Both Mr. Bogardus and Mr. Swin were stockholders of the defendant at this time, and were interested in the defendant. For a part of the time in 1893 and 1894 Mr. Lewis was an officer of both companies. It is apparent from the relation of these various persons to the defendant that not only was there a pecuniary interest as stockholders of the defendant, but there was an active interest in the whole situation. The defendant not only had the guaranty fund of $4,000,000 as security for the performance of the lease (as well as other property of large value), but it also had an interest in the expenditure of the money, the proceeds of the stock and bonds provided by article 5 of the lease, and also of such fresh money as might be furnished by the plaintiff independent of such source. In the event of a default by the plaintiff in the performance of the covenants of the lease, the whole of this very large amount became forfeited to the defendant.

[1] There was therefore not only an interest in what could be reaped from the continuance of the lease, but there was the great increment to accrue to the defendant if the plaintiff should default under the covenants of the lease. This situation created a condition which made it highly improper for the persons thus interested in the defendant to be in the active control and management of the plaintiff. The law condemns such relation. The leading case in this state upon the subject is that of Munson v. S., G. & C. R. R. Co., 103 N. Y. 58, 74, 8 N. E. 355, in which it was held that, when the adverse interest is made to appear, the law invalidates all contracts made by the trustee or fiduciary in which the latter was personally interested.

at the election of the party who was represented by him or them. The court said:

"The law permits no one to act in such inconsistent relations. It does not stop to inquire whether the contract or transaction was fair or unfair. It stops the inquiry when the relation is disclosed, and sets aside the transaction or refuses to enforce it, at the instance of the party whom the fiduciary undertook to represent, without undertaking to deal with the question of abstract justice in the particular case."

And this rule is applied even though there be no suggestion of actual fraud in the transaction. The rule announced in this case is the settled law of this state (Barr v. N. Y., L. E. & W. R. R. Co., 125 N. Y. 263, 26 N. E. 145) and is so uniformly adopted in nearly all jurisdictions that there exists no need to cite further authority in its support. It is quite probable that interest may be so remote in a given case as not to call for the application of the rule above announced. Mr. Morawetz makes distinction in this language:

"A merely nominal or a naked legal interest in the subject-matter of a transaction would not disqualify an agent from representing his principal in the transaction, if there is no temptation to the agent to obtain an advantage at the expense of the principal." Morawetz, Private Corporations, § 521.

The Court of Appeals, in Beveridge v. N. Y. E. R. Co., 112 N. Y. 1–28, 19 N. E. 489, 2 L. R. A. 648, recognized that an interest might be so slight and free of any taint of possible wrongdoing as not to call for its undoing The court uses this language:

"The appeal to equity, when the acts complained of are within the powers of directors and apparently uninfluenced by corrupt motives or personal interests adverse to those of stockholders, ought, at least, to be justified by some showing that these acts were improper within the belief of a fair proportion of the body of stockholders."

These exceptions, if they may be so characterized, only accentuate the rule to be applied when the adverse interest appears. The acts here complained of are condemned by the terms of the exception, for there existed, not only the clear adverse interest, but as a result of their actions the directors and officers of the plaintiff as stockholders of the defendant might receive a very large pecuniary benefit. We experience no difficulty in reaching the conclusion upon this branch of the case that the referee's findings were abundantly sustained by the evidence.

[2] It is claimed by the defendant that, even though this conclusion be correct, yet as the Traction Company was the owner of all the shares of the plaintiff's stock, and authorized the execution of the tripartite agreement, the same became binding against the plaintiff, even though the directors had an adverse interest. This is only another form of stating that the stockholders of the plaintiff have ratified the transaction, and therefore have cured any defect which may have existed.

It is a sound proposition, I think, that the stockholders of a corporation may ratify an act which they or the corporation might avoid. The act of ratification must be founded upon knowledge of the situation or upon acquiescence in the action after knowledge or in the

retention of benefits derived from the voidable action.    This principle is well recognized.    Barr v. N. Y., L. E. & W. R. R. Co., supra; Continental Ins. Co. v. N. Y. & H. R. R. Co., 187 N. Y. 225, 79 N. E. 1026.

[3] We are therefore to see if this rule of law is applicable to the present facts.    The referee found that:

"On February 14, 1893, Hollins & Co. were the owners of all the capital stock of the plaintiff."

While this in a general sense was true, yet it is apparent that the finding in a literal sense is not in accordance with the facts.    It is true that the witness Burke stated that Hollins & Co. before February 14, 1893, had bought and owned all of plaintiff's capital stock, yet it is quite evident when the undisputed evidence is considered that the statement is not accurate.    Mr. Lewis stated:

"When the negotiations first began, the stock of the Heights Company was owned by stockholders, not comprising Hollins & Co.    When the lease was executed, it was owned by Hollins & Co. and their representatives."

At this time there were 13 directors of the plaintiff, and the law then required:

"The directors of every stock corporation shall be chosen from the stockholders,  *  *  *  and if a director shall cease to be a stockholder, his office shall become vacant."    Stock Corporation Law (Laws 1890, c. 564) § 20, as amended by Laws 1892, c. 688.

The directors of the plaintiff at this time were in office and must be assumed to have been qualified as the law required.

Mr. Hollins testified:

"We were at the time of obtaining the lease, or previous thereto, the owners and controllers of the stock of the Brooklyn Heights Railroad Company."

In the offer of Mr. Lawrence to purchase the stock of the Long Island Traction Company, it was recited that the capital stock of the Brooklyn Heights Company was under the control of the New York Guaranty & Indemnity Company, 1,935 shares "of which it will deliver to this company when the Brooklyn Heights Railroad Company take possession of the leased railroads of the Brooklyn City Railroad Company, and as to 65 of which option to purchase will be given."

The agreement of April 7th between the Traction Company, the Indemnity Company, and Lawrence, contained an agreement upon the part of Lawrence to transfer to the Traction Company 1,935 shares of the capital stock of the Brooklyn Heights Railroad Company and to transfer to the Long Island Traction Company the accompanying option to purchase the remaining 65 shares of stock of the Brooklyn Heights Railroad Company when the latter entered into possession of the leased property.    It is therefore evident that 65 shares of the capital stock was not held by Lawrence or the Traction Company. The directors must have held some of it.    The testimony of Hollins was undoubtedly quite accurate when he stated that his firm owned and controlled all of the capital stock of the plaintiff.    It is possible that at the date of the lease the directors of the plaintiff were act-

ing for Hollins & Co. and in their interest; but this did not interfere with the legal ownership of the stock which was necessary for them to own in order legally to act as directors, nor did it change such relations that Hollins held or could compel delivery of options for such stock or compel delivery of such stock to his firm. It is therefore evident that Hollins & Co. were only the legal owners of 1,935 shares of the plaintiff's capital stock at the time of execution of the lease. There is no evidence that Hollins & Co. or the Traction Company thereafter acquired these 65 shares of stock. On the contrary, it is certain that such shares of stock were at all times retained to qualify the directors of the plaintiff. When the Traction Company joined in the execution of the tripartite agreement, it was not the sole stockholder of the plaintiff and could not bind those stockholders who held stock that it did not own. The contention that the tripartite agreement was ratified by all of the stockholders of the defendant cannot be sustained in view of this situation, as the same was not ratified by all of the stockholders of the plaintiff, which was necessary to cure the voidable character of the agreement.

But if we assume that the Traction Company was the legal owner of all the capital stock of the plaintiff, and give literal effect to the finding of the learned referee in this respect, the result is not different. The referee found (plaintiff's request 52):

"That the stockholders of said Long Island Traction Company never ratified or approved the said tripartite agreement. They never ratified or confirmed the action of its said board of directors in approving of the same."

Also, the fifty-third request:

"That the stockholders of said Long Island Traction Company never ratified or approved the said tripartite agreement. They never ratified or confirmed the action of its said board of directors in approving of the same."

These findings are supported by the testimony.

The action which is relied on to support the claim of ratification does not commend itself to the court as being founded in good conscience or equity. It appeared that the plaintiff and the Traction Company were controlled by a common board of directors. The referee so found at the defendant's request. We thus have a situation presented where the board of directors of the plaintiff were disqualified from acting for the plaintiff by reason of an adverse interest in the defendant, yet it is argued that this same board at the same time could act for the Traction Company, create a valid obligation against it in favor of the same defendant in which it had a pecuniary interest, and by such act ratify and confirm its former illegal action when acting for the plaintiff, and thus validate the whole. This common board of directors was disqualified from acting for either the plaintiff or the Traction Company, they were alike disqualified as to each by reason of the interest which they had in the defendant, and they could not by doing two wrongs make one right. Both the plaintiff and the Traction Company were dealing with the defendant at arm's length, and both were entitled to an impartial representation in such dealing. The board of directors, acting for the plaintiff, were incapacitated, and their act was illegal; but as stockholders of

the plaintiff, representing the Traction Company, they now assume to cure the former wrong by another illegal act, and thus ratify the whole transaction. This is the plain conclusion we must reach if this contention be sustained. At no time in the transaction resulting in this agreement can it be said that the common board of directors of the plaintiff and the Traction Company could give that impartial representation to which each was entitled. The transaction was entire. The acts of the directors were contemporaneous as to each interest which they assumed to represent, and the same illegality attended and nullified each action. There exists no more basis for sustaining the action of the board as to one corporation than to the other. The whole action falls under the ban of the law, and there can be no ratification where the taint attaches to the entire transaction.

[4] Under the circumstances of this case, it seems clear that there could be no ratification except by the action of the stockholders of the Traction Company taken with knowledge of the situation. The Traction Company was a holding company, and its stockholders were widely distributed. While they did not hold the legal title to plaintiff's capital stock, yet they had an equitable interest therein, and illegal acts ratifying such stock by their board of directors which might be cured would require ratification by them in like manner as to any other property in which they were interested as stockholders and concerning which their rights would be affected. 4 Thompson on Corporations, § 5314.

[5] The principle which underlies this conclusion is found in many cases, and in this state the rule is uniform. Where the action which has been taken is voidable and no public interest is involved, the illegal act may be ratified, and such ratification may be inferred from circumstances, or the retention of benefits received. As was said by Judge Gray, in Barr v. N. Y., L. E. & W. R. R. Co., 125 N. Y. 274, 26 N. E. 145:

"The identity of certain of the directors of each company, when the lease was made; the interest of four of these common directors in the contract for the construction of the Suspension Bridge road and in the stock and bonds to be guaranteed, as a condition of the leasing of the road—stamped the whole transaction as a fraud upon the Erie Company and brought it under the condemnation of the rule, which forbids those who fill fiduciary positions from making use of them to benefit their personal interests. This rule is deservedly strict in its requirements and operation. It extends to all transactions where the individual's personal interest may be brought into conflict with his acts in a fiduciary capacity, and it works independently of the questions of whether there was fraud, or whether there was a good intention. Where the possibility of such a conflict exists, there is the danger intended to be guarded against by the absoluteness of the rule. * * * But the rule does not operate to avoid ab initio all transactions of a trustee, where he is interested; but is generally limited in its operation to rendering them voidable, at the election of the party whose interests are concerned in the question of their affirmance or disaffirmance. If, therefore, nothing is done in avoidance, the transaction remains. If knowledge and opportunity concur, whereupon to move, delay, if unreasonable, or attended by retention and enjoyment of the results of the transaction, may be deemed equivalent to an adoption and ratification of that which before was the subject for action, in repudiation of any obligation."

The same doctrine is announced in Little v. Garabrant, 90 Hun, 404, 35 N. Y. Supp. 689, Steinway v. Steinway, 2 App. Div. 301, 37 N. Y. Supp. 742.

Many other cases might be cited. The facts and circumstances in the particular case are the controlling elements. As applied to the present case, there is no basis upon which to invoke the exception from the strict rule. Here the illegal act is admitted. There has been no acceptance of benefits taken or retained. There has been no ratification by stockholders of the Traction Company, and no ratification by stockholders of the plaintiff. The action of the board of directors in authorizing the execution of the contract by the Traction Company was not a ratification by stockholders nor the equivalent for such purpose. There has been no negligence in the assertion of rights. Such question is urged upon our consideration by the appellant. The referee, however, found that there was no negligence in the assertion of rights, and such finding is well sustained by the evidence. We are of the opinion upon this branch of the case that the illegal acts of the board of directors in the execution of the tripartite agreement have not been ratified by stockholders or otherwise validated.

[6] This brings us to a consideration of the agreement itself, whether by its terms and in all the circumstances a valid accord and satisfaction is established. It has been argued that the learned referee based his decision, in holding that there was no accord and satisfaction, solely upon the ground that the tripartite agreement was voidable because of the adverse interest of the directors in the defendant. There is no reason for so limiting the scope of the referee's decision. He found as a fact and also as a conclusion of law that there had been no accord and satisfaction, and it may well be that he rested his decision upon other considerations. At least, his conclusion can be sustained if a proper consideration of the agreement supports it.

It is clear that when the agreement was executed there had been no general accounting between the parties. While the referee found that the accounts were examined, such finding is quite consistent with the fact that there was no general examination of all the accounts. It is impossible, under the circumstances, that there could have been; the defendant did not open a separate account relating to the expenditure of the $6,000,000, the proceeds of the stock and bonds. It made no change in its method of bookkeeping after the transfer of possession of the property, or at any other time. In this connection Mr. Lewis was asked:

"Q. Did you put on the books of the company any special account; did you open an account to cover this matter of construction after the date of the lease, so as to separate it from the work of construction prior to the lease? A. I don't recollect that. The books undoubtedly would show that. * * * I have no recollection of any cut-off being made so as to distinguish between the work that had been done previous to the date of the lease and the work done after the date of the lease. There was no necessity for it. I do not recall that any such account was opened. Q. Do you remember that any account was opened showing disbursements separately before and after the 6th of June, or was it all carried right along in the same account? A. It was all carried along in the same account and susceptible to dissection at any time. The operation was carried right along."

The accounts which were examined prior to the execution of the agreement are made to appear quite clearly by all of the testimony both oral and documentary. Mr. Bogardus and Mr. Swin made such examination as was made, and to some extent Mr. Lewis examined the books, and from the result reached by Bogardus and Swin, based upon such examination, the "yellow sheet," so called, was prepared, and it furnished the basis for the execution of the note for $308,-340.35. Mr. Phelps made an examination of the plaintiff's books at this time, for the Guaranty & Indemnity Company, for the purpose of discovering the amount of expenditures which had been made by the plaintiff upon the property. His report showed that there had been expended by the plaintiff and was due from the defendant at that time at least $1,059,154.55. This indebtedness was not taken into account or considered by Bogardus, Swin, or Lewis, and found no mention in the yellow sheet. Expert accountants have since been employed upon the books covering a period of years in an attempt to arrive at a true state of the accounts between the parties, and in many respects the accountants have been unable to agree. It is not essential that a critical examination be made of the figures appearing upon the yellow sheet. It is manifest that such account did not furnish a true statement of the accounts existing between the parties. It was based upon a series of arbitrary assumptions and contained charges against the plaintiff which were without justification or foundation under a proper construction of the lease and also under correct business dealings.

From all the testimony it is readily discovered that there was no examination of all of the accounts between the parties, and therefore there could be no accurate statement showing which company was indebted to the other. As there was no accounting, and as the moneys due from the defendant to the plaintiff at this time exceeded a million of dollars, and ultimately the defendant came to owe the plaintiff $1,740,258.38, effect should not be given to this agreement as a binding accord and satisfaction unless so compelled to do by an inexorable rule of law. That we are not compelled so to find, we think, is reasonably clear.

[7] To constitute an accord and satisfaction it must appear that the parties intended to make a settlement of claims either admitted or in dispute. If the parties reach a conclusion upon such question, and the same is founded upon a good consideration and is subsequently executed by performance, the transaction is upheld as a valid accord and satisfaction. As the settlement is mutual, it must operate in binding force upon the parties to it.

Various cases illustrate the rule as applied to a variety of conditions. Ryan v. Ward, 48 N. Y. 204, 8 Am. Rep. 539; Fuller v. Kemp, 138 N. Y. 231, 33 N. E. 1034, 20 L. R. A. 785; Bandman v. Finn, 185 N. Y. 508, 78 N. E. 175, 12 L. R. A. (N. S.) 1134; Panzerbeiter v. Waydell, 21 Hun, 161. As the foundation of an accord and satisfaction, there must be established a settlement of some matter either admitted or disputed. If the subject of the contract be a settlement of the matter, the elements of an accord and satisfaction

are present. When the same is executed, it becomes a binding contract which, upon fulfillment, creates a bar from further litigation of that subject. If the settlement does not embrace all of the matters existing between the parties, then no bar exists in the future adjustment of their relations respecting such subject. The contract in the present case is claimed to be a bar because it constituted a binding adjustment of all matters arising out of the fulfillment by the defendant of all of its obligations under the lease. If it was not a settlement of all such matters, then it cannot be invoked as a bar to the maintenance of this action. To constitute it a bar, it must operate equally upon both parties. That is to say, the plaintiff could enforce no claim arising out of the situation, and likewise the defendant would be so concluded. When this contract is considered in this light, it is evident that it lacks the primary requirement of a complete settlement. The contract primarily was for the purpose of raising money to meet what was then assumed to be the necessities of the plaintiff. There would have been little need for such contract had the defendant in good faith applied all of the moneys which were secured to the plaintiff pursuant to the provisions of the lease. It was permitted by the officers and directors of the plaintiff to have recited in the preamble of the contract that the plaintiff was indebted to the defendant in large sums of money for advances made to it for conversion construction, and that plaintiff "has contracted other debts in and about the premises" (these recitals were wholly without foundation if in fact there was no indebtedness, of any character, existing in favor of the defendant); that for the purpose of providing for the payment of the indebtedness, it and the Traction Company are about to issue their joint promissory notes in amount sufficient at a given price to produce $1,500,000. The defendant upon the security of these notes and for other considerations agreed to provide $1,375,000 in addition to that raised by defendant and the Traction Company. After providing that the defendant should advance the last abovenamed sum and pay it to a disbursing committee, as in the contract provided, the third paragraph made the following provision:

"The 'Heights Company' and the 'Traction Company' jointly and severally agree that at or before the delivery of this agreement they will execute and deliver to the 'Brooklyn Company' their joint and several promissory note, payable on the first day of August, 1897, or sooner, after the first day of July, 1895, at the option of said 'Heights Company' and 'Traction Company,' which note shall be for the sum of three hundred and eight thousand three hundred and forty and $35/100$ dollars, ($308,340.35) *being a part of the indebtedness* of the said 'Heights Company' to said 'Brooklyn Company,' and shall bear interest at the rate of six per cent. per annum, payable semiannually."

This clause further provided for the deposit of the notes issued by the plaintiff and Traction Company in given amounts as security for the payment of this note, and that said amount should be credited upon the $1,375,000 to be advanced by the defendant as before provided.

If this agreement as to the indebtedness of the plaintiff to the defendant had stopped with this provision, it could not be claimed that it constituted the settlement of any accounts existing between the

parties.  Its effect was to make provision for the payment of $308,-340.35 by giving a promissory note and providing for its payment. There is not the slightest indication that it was in settlement of the accounts existing between the plaintiff and defendant.  On the contrary, any such assumption is excluded by the express provision that the amount of the note was a part only of an existing indebtedness. There cannot exist upon these facts any basis for the claim of a settlement of all the transactions and accounts existing between the parties.  It does not assume to make such settlement.  Such accounting is left open by express language.  There is no basis for saying that here was an accord and satisfaction of all matters, as a further claim of indebtedness was asserted.  Such provision would not bar the defendant from making a further claim, and certainly, if the defendant was at liberty to assert further claims, the plaintiff stands upon the same plane and can assert any and all claims which it possessed.  The rights of each operate mutually, and neither is foreclosed of asserting rights which it possessed without limit.

There is not found in this contract any further reference to the settlement of any indebtedness or of any account between these parties that did not arise out of those terms of the contract which have direct relation to its scheme to raise money by issuing of notes of the plaintiff and the Traction Company.  The agreement itself, neither in its terms nor by inference, assumes to determine finally the accounts existing between the parties or to take and make a binding settlement of the expenditures by the defendant of the $6,000,-000 which it was bound to furnish under the provisions of the lease. No mention was made of such subject, and the terms of the agreement relating to the indebtedness of the plaintiff excludes it.  The words "final settlement" are nowhere used, nor are there words of equivalent import.  No final indebtedness was ascertained.  It was not embraced in the $308,340.35 note, and as it was not embraced therein, it could not be elsewhere, as it was not again referred to save in making provision for its payment, and nothing said about it enlarges the scope of the language heretofore quoted relating thereto.

It is claimed that the fourth paragraph of the contract contains language showing a complete and absolutely final settlement.  It reads:

"Fourth. The 'Brooklyn Company' agrees from time to time, as hereinafter provided, to advance the money requisite to pay any balance due, or to become due, on contracts made by it for the construction, conversion and equipment as electric railroads of said railroads demised by it to said 'Heights Company,' and any balance due by it as of date of June 6, 1893, for other purposes, which said balances amount to three hundred and forty-seven thousand and thirty-six and 44/100 dollars ($347,036.44) or thereabouts."

This provision shows that it did not relate to any personal indebtedness of the plaintiff to the defendant.  The whole paragraph relates solely to obligations created by the defendant in favor of persons other than the plaintiff, for which the defendant had assumed a corporate obligation quite independent of the plaintiff.  It proposed to provide for the payment of obligations for which it was personally liable.  It may be that under the provisions of the lease, as between the plaintiff and defendant, the former was liable to pay the obligations in this

respect for which the defendant had obligated itself. This fact could only be determined upon a full accounting. Assuming that the plaintiff was so obligated, it is evident that the indebtedness for which provision was thus made was quite independent of the personal indebtedness provided for in paragraph 3 of the agreement. It related to an entirely different matter and was quite independent thereof. There is not a syllable in the fourth paragraph from which a conclusion or an inference can be derived that it was intended to settle the indebtedness of the plaintiff to the defendant, of which the $308,340.35 note formed a part. That indebtedness remained open, and any idea of a settlement was expressly excluded, as it was in terms recited that it was only a part of such indebtedness. The paragraph did not assume to deal with such question; it remained open and excluded the idea that there could exist a binding accord and satisfaction. The fact that the plaintiff and the Traction Company were to give notes for the sum recited in said paragraph did not change the transaction, nor did it affect the indebtedness for which provision was made. If it be admitted that the defendant intended to secure itself from any liability on account of the contracts made by it or for other purposes in that connection, the situation is not changed. It still remains the fact that by the very terms of the agreement the settlement was not final, made so by express words, and, such being the case, it did not conclusively determine and settle the reciprocal financial obligations of plaintiff and defendant. Aside from this question is another which is fatal to the claim that the tripartite agreement constituted a binding accord and satisfaction. The contract was executory. In order that it should operate as a binding agreement, it must have been fulfilled by the defendant in strict accordance with its terms, else it cannot invoke its aid as a bar. Kromer v. Heim, 75 N. Y. 574, 31 Am. Rep. 491; Bandman v. Finn, supra.

The defendant was required by its terms to advance the sum of $1,375,000. This was dependent upon the plaintiff and the Traction Company paying the sum of $1,500,000. The last-named companies fulfilled the contract in this respect by paying such sum to the disbursing committee. The defendant was to be credited upon the sum which it was to pay with the amounts for which the plaintiff and the Traction Company were to give their notes. This left for the defendant to advance in cash above these two items something above $700,000. The plaintiff and the Traction Company gave the two notes, and the same with interest were subsequently paid to the defendant. The latter paid in discharge of its own obligations upon contracts executed by it, and for other purposes, about the sum of $350,000. It paid no more upon the obligation which it thus assumed. Unless it be excused by some matter, it is manifest that it cannot invoke the aid of this contract as a plea in bar, for confessedly it never fulfilled it. To use the language of the defendant, the excuse for nonfulfillment is thus stated:

"No moneys therefore were to be advanced by defendant after its direct obligations were disposed of except upon the pledge of the unused real estate when released from the Kings County Trust Company mortgage; and there is not a shred of evidence, nor is it pretended, that this was ever done,

or that real property was presented to defendant for the making of a loan thereon."

By the eighth paragraph of the contract the plaintiff agreed that the real estate which shall not so be required for the maintenance and operation of the demised railroad shall be released and made "free and clear of the lien of said lease and may be sold by said 'Brooklyn Company' at public or private sale." The effect of this clause was to confer power upon the defendant to sell any and all such real estate, and the plaintiff agreed that it should be released from the lien of the lease. As the defendant had title, this was all that was necessary for that purpose. The same clause provides how the proceeds shall be applied. By the ninth clause the defendant agrees that, as soon as the real estate is made free and clear of the lien of said lease and released from the mortgage now covering the same, under which mortgage the Kings County Trust Company of Brooklyn is trustee, defendant will from time to time advance, etc. It is noticeable that the plaintiff agreed in precise terms to release the real estate from the lien of the lease. So far, therefore, as it had power, it had bound itself to put it within the power of the defendant to sell the same free of such lien. As to the release of the land from the lien of the mortgage held by the Kings County Trust Company, there is no such covenant upon the part of the plaintiff. The manifest reason for this omission may be found in the fact that neither the plaintiff nor the Traction Company had any control over the subject-matter. They had no power to procure such release. The only party who had control over such subject was the defendant. It had executed the mortgage, and upon it devolved the obligation of procuring the release. The agreement clearly provided for the releases. One required the act of the plaintiff; the other, it must be assumed, devolved upon the defendant, as it was the only one having power in the premises to procure it. This being the situation, it devolved upon it to show that it was not at fault in this respect. It could not default in advancing money if such default rested upon its failure to do some act within its power to do, and make its failure to act an excuse. No reason appears upon which to base an excuse in this respect which will relieve the defendant from its admitted default. When it sets up this contract as a bar, the duty devolves upon it to excuse default in performance before it can be so made effective. The omission to perform its terms is admitted by the defendant, and, this being so, it devolved upon it to show facts which exonerated it from performance before it can invoke its aid as a bar. This it has not done.

Thus we have discussed the contract upon the theory that this question was raised and properly in the case for disposition upon the merits. A careful examination convinces us, however, that the record does not disclose a situation in which this question can be properly considered upon the merits.

[8] The contract called for the advance by the defendant of the sum provided for in the fourth clause of the agreement, and, after this sum and the amount of the note provided for in the third clause, it was to provide an additional amount to bring the whole sum up to

$1,375,000. The defendant in its answer has not pleaded that it fulfilled all of the obligations which it assumed pursuant to the provisions of the tripartite agreement. It pleads affirmatively the giving of the two notes and their subsequent payment by the plaintiff, the Traction Company, or their successor. Then it alleges that it advanced the further sum of $350,000. Beyond this there are no allegations of the fulfillment of this contract by the defendant. The rule is well settled that, where a party relies upon an executory contract to support a cause of action or sustain a defense, he is required to allege and prove fulfillment upon his part of the covenants which he was obligated to perform. Smith v. Wetmore, 167 N. Y. 234, 60 N. E. 419; Kay v. Metropolitan St. Ry. Co., 163 N. Y. 447, 57 N. E. 751; Grant v. Pratt & Lambert, 87 App. Div. 490, 84 N. Y. Supp. 983; F. L. & T. Co. v. Siefke, 144 N. Y. 354, 359, 39 N. E. 358.

The fact of performance of an executory contract where fulfillment is essential to a cause of action, or is relied upon to support a defense, is a condition precedent, and as such is required to be pleaded. Code Civ. Proc. § 533.

If the contract has not been fulfilled and the party relies upon some act of the adverse party as an excuse for nonfulfillment, such fact must be pleaded and proved. Todd v. Union Casualty & Surety Co., 70 App. Div. 52, 74 N. Y. Supp. 1062; Fox v. Davidson, 36 App. Div. 159, 55 N. Y. Supp. 524; Fisher v. Goodrich, 61 App. Div. 534, 70 N. Y. Supp. 38.

[9] Under the defendant's answer, no facts are alleged which show fulfillment of all of the terms of this contract which it was bound to perform, and no facts are stated showing any excuse for nonperformance either by act of the plaintiff or otherwise. It seems to follow, as a necessary conclusion, that under this clause of the answer no defense is sufficiently alleged and none has been proved thereunder, even though it had been so alleged. There was no admission by the plaintiff of any fact in this connection which obviates this defect. The matter set up by defendant by way of defense and avoidance is deemed controverted by the plaintiff without affirmative pleading. Davis Confectionery Co., Inc., v. Rochester G. Ins. Co., 141 App. Div. 909, 126 N. Y. Supp. 723; Sullivan v. Traders' Ins. Co., 169 N. Y. 213, 62 N. E. 146.

We have carefully examined the record and are unable to find, either in the pleading or in the proof, any facts which warrant us in holding that the tripartite agreement constitutes a binding accord and satisfaction and therefore a bar to the maintenance of this action. Aside from this, it appears that, at the time when the default was declared by the defendant, the plaintiff was in dire straits. The temptation to so default the plaintiff was very great, and the resulting prize was large. Such condition was due to the failure of the defendant to pay over the moneys which it was obligated to pay. Under such circumstances, the court is not called upon to strain rules in order to support technical objections. This conclusion would seem to render it unnecessary to consider whether the intervention of a court of equity was necessary to set aside this contract before bringing this

action, though we will take up the consideration of that question later on in this discussion.

[10] It is urged that the plaintiff cannot maintain this action for the reason that it is not the owner of the cause of action sought to be enforced. The claim of the defendant rests upon the ground that the plaintiff executed a mortgage to the New York Guaranty & Indemnity Company which covered the moneys, claim, and property right which the plaintiff now seeks to enforce; that the foreclosure and sale under that mortgage absolutely divested the plaintiff of all title and interest in its claimed present cause of action. The relevant instrument in determination of this question is correctly stated by the defendant to be the above-mentioned mortgage to the Guaranty & Indemnity Company. If the cause of action passed from the plaintiff at any time, it passed by this instrument. The correct answer to this question requires a consideration of certain provisions of the lease, the terms of the mortgage, and the intent of the parties in its execution.

It seems clear from the provisions of the lease that the parties contemplated that there should be no permanent expenditure of moneys by the plaintiff until the $6,000,000 provided for in article 5 of the lease should have been applied and that sum actually disbursed in the conversion of the railroad.

Article 21 of the lease prohibited the plaintiff from advancing any money out of its own funds for the construction of any branches, additions, and improvements or to furnish equipment, until the proceeds of the unissued stock and bonds "shall have been expended as in this lease provided." And by article 22 it was provided that, if the moneys of the lessor on hand at the date when the lease takes effect, after certain deductions and the proceeds of the stock and bonds, should be insufficient to pay for the conversion of the railroads, "then and in that event" the plaintiff was required to furnish from its own funds money to finish the work and prosecute the same with diligence. These provisions make it clear that the defendant intended that the plaintiff should not advance any moneys of its own until it had advanced and there had been expended the sums of money which defendant had obligated itself to furnish. These clauses required not only that the defendant should claim that it had advanced the sum of the moneys which it was obligated to furnish, but they were mandatory upon it to furnish the same. It could not be discharged from such obligation save by precise fulfillment. It is said that it was recognized in March, 1894, by both parties, that defendant's conversion funds had been exhausted, and that thereafter it borrowed and paid as a permanent appropriation $500,000, and that such sums "were paid literally out of its own funds," and therefore, as no request was made for repayment, it must of necessity have been understood that such moneys were only repayable at the termination of the lease. We have already considered the adverse interest of the plaintiff's board of directors and its officers, and from which it appears that at this time the plaintiff was without an impartial representative; that such representation as it had was in the interest of the defendant.

It is probably true that plaintiff's officers, who should have protected

it against this baseless claim of the defendant, did yield that the conversion funds to be furnished by the defendant were about exhausted. But this yielding of the claim did not change the fact that the defendant had not advanced all of the moneys which it had agreed to advance, nor did it lessen its obligation in that respect. It was as much bound at that time to furnish in full sum the amount of money which it had obligated itself to furnish as it was when it entered into the obligation. It could no more limit its liability to furnish the full amount than it could have refused to advance any, and it could not be discharged from such liability, no matter what should be its claim, except by complete performance. If the parties had made a mistake in supposing that the obligation has been completely fulfilled, would it be claimed that such fact relieved the defendant unless some other consideration intervened to its prejudice? No one would make such a claim. The most favorable construction that can be placed upon the action of plaintiff's officers is that they were mistaken in their assumption. But this did not change the obligations of the defendant nor excuse it from performance. How, then, can it be said that in procuring money and using it for purposes of construction the plaintiff utterly relieved the defendant from its obligation to repay such money, when the latter by mandatory provision had said that no moneys should be advanced by the plaintiff from its funds until the defendant had discharged its obligation in this respect. To hold, under the circumstances of this case, that by this act the defendant was relieved of its obligations to furnish further moneys which the terms of the lease imposed, and that the plaintiff was not entitled to be reimbursed for such expenditure, would violate the plainest principles of equity, and no rule of law of which we are aware requires it.

In every provision of the lease relating to the expenditure of money raised by defendant, or the application of the proceeds of property belonging to it, the clear provisions are that each shall be applied to the conversion of the road into an electric road, and the lease fairly contemplated that the plaintiff should not be called upon to advance any of its own funds until such moneys should have been used in particular application. This situation has a manifest bearing upon the provisions of article 10 of the lease, by the terms of which the defendant covenanted that at the expiration of the lease or other sooner termination it would pay "to the lessee the actual cost of all property, extensions, branches, additions, improvements and equipments, made, acquired and paid for by said lessee out of its own funds for use in connection with the operations of the railroads of the lessor," less the cost to preserve and to secure efficiency in operation.

The contention is that, although the defendant failed in its obligation to furnish the money as it agreed, and thereby compelled the plaintiff to borrow money to apply upon conversion, under claim by the defendant that it had fulfilled, thereby the defendant was absolved from its obligation, and the plaintiff is postponed to the termination of the lease for reimbursement.

It is admitted that in practical fulfillment of the lease the plaintiff advanced moneys to discharge obligations for conversion, and the de-

fendant thereafter reimbursed it therefor. Why should there be any change in this regard because the parties mistakenly supposed that defendant had complied with its obligation? When the fact was made clear, it did not revive the obligation, for that already existed, and it cannot be said that it postponed the immediate discharge of the obligation, for when ascertained the duty to pay was immediate. Such we conclude are the rights and obligations of the parties construed in the light of the provisions of the lease.

It seems clear that the moneys advanced by the plaintiff which the defendant was to repay were not intended to be embraced within the terms of the mortgage, and were not so embraced by the language used. If they were so covered, it is found in the language used in item 4 of the mortgage, which provides:

"All the right, title and interest of the Heights Company in and to the amount of the cost of all property, extensions, branches, additions, improvements and equipments heretofore and hereafter made, acquired and paid for by said Heights Company out of its own funds for use in connection with the operations of the railroads of the Brooklyn City Railroad Company, less the cost of such part thereof as shall or may be required to preserve said railroads, extensions, branches, additions, improvements and equipments in good repair and serviceable condition during the existence of the lease hereinabove mentioned from the said Brooklyn City Railroad Company, as lessor, to said Heights Company, as lessee, less the cost of such part thereof as shall or may be necessary to preserve and secure efficiency in the operation of such railroads; such cost, as aforesaid, being payable under the terms of the lease above mentioned by said lessor company to said lessee company in the event of the expiration of said lease or other sooner termination thereof."

The language of this item of the mortgage is in all substantial respects the same as that contained in articles 10 and 23 of the lease, and when, as we have already seen, they are construed with the other provisions of the lease relating to that subject, it announces the unmistakable intention of the parties to embrace therein only such moneys and funds as should be advanced by the plaintiff after the defendant had applied all of the moneys which it was obligated to furnish, which included the $6,000,000 without any deduction whatever. All moneys advanced by the plaintiff prior to the fulfillment by the defendant of this obligation were not moneys whose payment was postponed; such moneys were undoubtedly due and repayable by the defendant as soon as such indebtedness was incurred.

The language of item 4 of the mortgage is too plain and unmistakable in this respect to admit of doubt, and when it is considered in connection with the provisions of the lease and the rights and obligations of the parties thereunder, by precise language and in legal effect it is limited to such moneys and funds as would, if every obligation was fulfilled by both parties to the lease, be postponed in payment to the termination of the lease. This was the clear intent of the parties, and they so expressed it in unmistakable language. No debts and obligations which were immediately repayable by the defendant to the plaintiff were affected thereby.

It is insisted that the language of the recital that:

"All the right, title and interest of the Heights Company in and to the amount of the cost of all property * * * heretofore and hereafter

* * * acquired and paid for by said Heights Company out of its own funds"

—is broad and comprehensive and clearly embraces every expenditure made by the Heights Company which was at that time in existence. It is quite true that this language is broad and comprehensive, and in literal sense sufficiently so to cover the claim of the plaintiff existing at that time. The language is in substance the language of article 10 of the lease. The addition of the words "heretofore and hereafter" does not enlarge the scope or purpose intended to be accomplished by the lease or by the mortgage. Both related to the same funds, and both contemplated in legal right a fund whose payment was postponed by the terms of the lease. The lease should not be broadened by construction beyond its fair import and the purpose sought to be accomplished. Its clear expressions are intended to create reciprocal and mutual obligations upon plaintiff's part to surrender all of the property it had received and all for which the defendant paid from the proceeds of the $6,000,000 or by other means without payment by the defendant at the expiration of the term; and for the defendant to pay for all property for which the plaintiff paid after the defendant had advanced what it was obligated to furnish. The mortgage was conceived and executed in like intention. The property or money with which the parties were dealing was that for which the lease provided, and its terms should receive the same construction. The lease not only authorizes, but requires, such interpretation to be placed upon the language used when considered in connection with the terms of the lease and what was sought to be accomplished. Robertson v. Ongley Electric Co., 146 N. Y. 20, 40 N. E. 390; Gillet v. Bank of America, 160 N. Y. 549, 55 N. E. 292.

In controverting this view much reliance is placed upon the report made by the accountant Phelps, who was commissioned by the Guaranty & Indemnity Company to examine and report what sum had been expended by the plaintiff for conversion purposes. His report showed that plaintiff had expended at that time $1,059,154.55. The claim is that this sum was necessarily embraced in the mortgage because it was so reported as having been expended by the plaintiff from its funds. Such claim could scarcely be sustained based upon the fact that Phelps made such report. He could not create an obligation against any party by making a report, and he could not in the slightest degree change the rights and obligations of the parties nor affect the proper construction of the lease or mortgage.

If the defendant had then recognized that it personally owed this sum to the plaintiff and was obligated to immediately discharge the debt, Phelps' report could not and would not affect it.

The situation was not changed when it appeared that defendant was in fact obligated to make immediate repayment. The obligation was as existent and obligatory at one time as at the other. And because of this obligation the defendant was then chargeable with knowledge. Such sum, although shown to exist by the Phelps report, was not embraced within the mortgage for the reason that the parties did not deal, and did not intend to deal, with moneys which the defendant

was obligated to immediately repay. They were dealing with an obligation of which payment was postponed by the language and terms of the lease, until the time of its termination, and with nothing else. It was that fund which it was intended to mortgage, and none other. As the fund reported by Phelps was not such fund, the parties did not deal with it, and it was not embraced therein. The sums of money which the plaintiff is shown by this record to have expended over and above the amount which the defendant was obligated to furnish shows that the parties were not dealing with a vain thing when formulating item 4. The fund which is the subject of that mortgage, it is evident, will be very large at the termination of the lease. Considering that this sum was not embraced within the terms of the Guaranty & Indemnity mortgage, it is clear that it did not pass under the foreclosure of that mortgage or become vested in the Brooklyn Rapid Transit Company by the mesne conveyances which followed. Nothing in any of these conveyances enlarges the scope of that mortgage.

We are unable to find that the Brooklyn Rapid Transit Company in any of its transactions with the plaintiff acquired title to the sum of money here in question. It is quite plain that the Brooklyn Rapid Transit Company in its dealings with the plaintiff had an interest in the moneys due from the defendant to the plaintiff; but we are not able to find from any contract between such parties or from any entry in the books that it acquired the legal title thereto, or that the plaintiff parted therewith. It seems at all times to have remained the owner of the same and is now entitled to enforce such claim. This contention upon the part of the defendant is clearly against equity.

It is contended that resort must be had to equity to set the tripartite agreement aside before an action at law can be maintained; but, if we are correct in the consideration of the agreement, then this question does not arise, and is not properly in the case. The learned counsel for the appellant says that the language of the lease not only provided "that the amount of the ascertained indebtedness of the Heights Company to the City Company should be incorporated in a note for that sum," but it further provided that all outstanding obligations of the defendant should be paid, and he cites the language of part of article 4. The vice of this contention lies in the fact that the $308,340.35 note did not represent an "ascertained" full indebtedness of the plaintiff to the defendant. It did not represent as to such personal indebtedness a final settlement, for the language of the third article is:

"Which note shall be for the sum of three hundred and eight thousand three hundred and forty and $^{35}/_{100}$ dollars ($308,340.35) *being a part of the indebtedness* of the said 'Heights Company' to said 'Brooklyn Company.'"

This statement is nowhere qualified. It cannot be true, therefore, that "the tripartite agreement effected a complete settlement." The amount of the personal accounts still remained open for adjustment between the parties, and either was at liberty to assert any claim in this respect which it possessed, and the tripartite agreement furnished

no obstacle defeating such right. There is here, therefore, nothing requiring the tripartite agreement to be set aside.

Assuming that it is in the case and its effect to be determined, I think there existed the clear legal right upon the part of the plaintiff to attack it and urge anything in defense which would have been available in a direct action to set it aside.

While it is true that the referee did not find affirmatively that fraud existed and base his decision upon that ground, yet he refused to find that there was no evidence that the entries in the defendant's books of account were false, fictitious, or fraudulent. And also refused to find that they were made in the regular and ordinary course of business. And he found generally that the agreement did not constitute an accord and satisfaction both as a fact and also as a conclusion of law.

The referee found affirmatively that many items relating to construction which appeared upon the defendant's books were not properly charged; that the moneys therein set forth had not been expended; and that "such books of account did not exhibit a true and correct statement of accounts between the plaintiff and defendant of moneys that had been expended for the purpose of constructing and transforming the said railroad into an electric railroad."

It is not necessary that fraud should be characterized as such if the evidence and findings fairly justify the inference of its existence. However these findings be construed, it is clear that this court can lay hold of the evidence, if it exist, to support the conclusion reached by the referee, even though he has made no affirmative finding of such fact.

In this case we think the evidence justifies the conclusion that the accounts reported by Swin and Bogardus and represented in the yellow sheet were fictitious in fact and known by them to be such. They were according to fair inference fraudulent in fact. This appears upon their face when coupled with the entire proof concerning the state of the accounts. It may be that the defendant did not have actual knowledge of this fact at the time of the execution of the tripartite agreement, but it adopted the act as its own, received the accruing benefits, and is bound by such agreement.

[11] The most favorable view to defendant and also to the officers of the plaintiff in charge at this time is that they were laboring under a mistake of fact, concerning the indebtedness recited in the agreement, and the mistake would furnish abundant ground to sustain the finding of the referee that the agreement did not operate as an accord and satisfaction quite aside from the adverse interest of plaintiff's board of directors and officers. Arthur v. Homestead Fire Ins. Co., 78 N. Y. 462–467, 34 Am. Rep. 550; Kirchner v. N. H. S. M. Co., 135 N. Y. 182, 31 N. E. 1104.

It is a settled rule of law that, where an answer contains new matter constituting a defense not by way of counterclaim but by way of avoidance, it is deemed to be controverted by the adverse party by traverse or avoidance as the case requires. Code Civil Procedure, § 522; Jackson v. Brown, 76 Hun, 41, 27 N. Y. Supp. 583.

In Flynn v. Equitable Life Ins. Co., 78 N. Y. 568, 34 Am. Rep. 561, it was said:

"Many of the distinctions between courts of law and equity as to the admission of evidence have necessarily become obliterated when these jurisdictions are blended, and are exercised by the same tribunal. In principle, written instruments can have no greater sanctity in courts of law than in courts of equity, and when authority exists for administering justice in either court, there is no sound reason why the evidence for that purpose should not be received in either court."

This rule is abundantly supported by many authorities. Argall v. Jacobs, 87 N. Y. 110, 41 Am. Rep. 357; Sullivan v. Traders' Ins. Co., 169 N. Y. 213, 62 N. E. 146; Wilcox v. Am. T. & T. Co., 176 N. Y. 115, 68 N. E. 153, 98 Am. St. Rep. 650; Smith v. Ryan, 191 N. Y. 452, 84 N. E. 402, 19 L. R. A. (N. S.) 461, 123 Am. St. Rep 609, 14 Ann. Cas. 505.

It seems to be admitted by the appellant that if the referee had found that the execution of the tripartite agreement was procured by actual fraud, and the evidence justified the finding, the decision could be sustained under the issue as it was raised. As we have seen upon the facts and the findings in this case, it comes quite close, if it does not embrace within it every essential fact necessary to authorize the application of this rule. But assuming that we would not be so justified, we think the principle upon which the referee's ruling must be sustained is the same.

In Kirchner v. N. H. S. M. Co., 135 N. Y. 182, 31 N. E. 1104, it is said:

"If the plaintiff can show that by a mutual mistake of the parties, or by what is its equivalent, a mistake on his part and fraud on the part of his adversary, the present cause of action is embraced in the release, contrary to the intent of the parties, or contrary to his intent in case fraud is proven, he is entitled to an instruction to the jury to the effect that the release does not bar his right to recovery."

Under these rules it must be true that any defense and any evidence which would be available to defeat and set aside an instrument in an action in equity is equally available when the same instrument is set up as a defense in an action at law.

Applying this rule to the present case, it is clear that the statement of account contained in the "yellow sheet," so called, was erroneous. fictitious, and did not exist in fact as a claim against the plaintiff even if plaintiff's officers had been authorized to bind it. The officers and parties then representing the plaintiff and the defendant both acted upon the supposition that these figures and this account were correct. This assumption was false. It necessarily follows that, if they or the defendant knew them to be false, they were guilty of a gross fraud upon the plaintiff. If they did not know them to be false, then they acted under a clear mutual mistake of fact, and such mistake operated to the distinct injury of the plaintiff. The situation does not admit of any middle ground in this aspect. It presents a clear case of either mistake or fraud, and in either case the plaintiff is entitled to the benefit of an adjudication that the agreement does not operate as a bar. But for the reasons above stated plaintiff's officers,

when they executed the tripartite agreement, were not authorized to bind it. There was therefore no assent to the contract therein stated. In such cases there is question that it may be avoided at law. Smith v. Ryan, supra.

[12, 13] The defendant further contends that a demand or request for expenditure on conversion was absolutely necessary before it could be held in default. We have pointed out the facts and findings rendering a demand unnecessary, viz., that the plaintiff was under the control of officers and directors acting for the defendant, whose individual financial advancement lay, not in guarding the interests of the plaintiff, but in the prosperity and betterment of the defendant. In addition to this, the answer expressly admits the averment of the complaint "that the plaintiff from time to time, prior to September 30, 1894, requested the expenditure by the defendant of the sum of $6,000,000 in payment of the cost of converting the railroads so demised into an electric railroad," and the undisputed evidence shows that on March 17, 1894, defendant's executive committee adopted a resolution which it thereafter adhered to, determining to retain in its possession such cash funds as it then held. This action by the defendant is a practical declaration that it would not advance further funds, and obviates the necessity of a formal demand which would be useless and without results, and from the making of which the law relieved the plaintiff. People v. Merchants' Trust Co., 116 App. Div. 41, 101 N. Y. Supp. 255, affirmed 187 N. Y. 293, 79 N. E. 1004; Hanna v. Lyon, 179 N. Y. 107, 71 N. E. 778; Niles v. N. Y. C. & H. R. R. R. Co., 176 N. Y. 124, 68 N. E. 142; Sage v. Culver, 147 N. Y. 241, 41 N. E. 513; Jacobson v. Brooklyn Lumber Co., 184 N. Y. 152, 76 N. E. 1075.

In answer to this, it is urged by the appellant: First, that the referee having found that no such request was made, his finding is controlling; and, second, that the admission referred to was coupled with, and limited by, the further allegation that defendant had in fact expended a greater sum than the amount requested, or for which it was obligated, under which construction the language used could not be held to be an admission of an uncomplied with request for expenditure. This contention ignores the fact that the complaint had no relation to expenditures made before the lease became effective by delivery of possession of the roads, and cannot be sustained. The defendant must be held concluded by the admission of its answer, and, this being so, the question of whether or not a demand was made was not one of the issues sent to the referee to hear and determine, and any finding of his indicating that no such request or demand was made is immaterial and may be disregarded.

[14, 15] It is not necessary to the support of the judgment that admissions in the pleadings be made part of the findings (Jacobson v. Brooklyn Lumber Co., 184 N. Y. 158, 76 N. E. 1075), and the findings of a referee upon any issue not referred to him are without force or effect (Savage v. Sherman, 87 N. Y. 277, 286; Ballou v. Parsons, 11 Hun, 602; Wright v. Delafield, 25 N. Y. 266, 268). It is a well-known principle of law, in support of which citation of au-

thorities is unnecessary, that if the findings do not conform to the cause of action alleged, but establish a different cause of action, the judgment based thereon must be reversed. Upon the same principle, findings of fact contrary· to the admissions of the answer, which but for the answer would constitute a defense, would not support a judgment for defendant. In the case at bar, a judgment for the defendant, on the ground that there was no demand by plaintiff of defendant for the expenditure of the money for conversion, such demand being admitted by the answer, could not be sustained in case of an appeal by plaintiff. It follows that the judgment for plaintiff, disregarding the finding that there was no such request, cannot be reversed because of such finding, in view of the admission in the answer.

[16] It is not controverted that the defendant expended for conversion between February 14, 1893, the date of the execution of the lease, and June 6th following, the time the property was taken over by the plaintiff, the sum of $1,481,057.58. The referee so found, but refused to give the defendant credit for such expenditure upon its contract obligation of $6,000,000, which it is contended presents reversible error. The lease is dated February 14, 1893, and was executed and acknowledged on that day. It was duly approved by plaintiff's stockholders on that day and by the stockholders of defendant on the day following. On April 17th the parties delivered, each to the other, a duplicate copy of such lease, article 47 of which provides:

"It is mutually covenanted and agreed between the lessor and lessee that this lease shall not be binding or valid as to either of the parties hereto until approved by the vote of the stockholders of the lessor and lessee as required by law, and that if so approved, this lease shall be delivered to the lessee at such time and upon such terms and conditions as shall be agreed upon by the board of directors of said lessor and lessee, but notwithstanding such approval and delivery, this lease shall not go into effect nor shall the lessee be entitled to enter into possession of the premises and property by this lease demised until said four million dollars ($4,000,000) shall have been actually deposited either in cash or in securities, or both, pursuant to the terms of this lease, with said Brooklyn Trust Company or companies designated by said lessor and lessee, nor until a certificate of said Brooklyn Trust Company or such companies to that effect is indorsed hereon or attached hereto, which certificate shall be duly executed by said Trust Company or companies under its or their corporate seals, and shall state that said four million dollars ($4,000,000), or such portion thereof as they respectively hold, is held upon the trusts and subject to the terms, covenants and stipulations and conditions in this lease contained with respect thereto."

Prior to such delivery the terms and conditions provided for in this subdivision of the lease were agreed upon and reduced to writing. The first and second sections provide for the delivery and acceptance of the lease on April 17, 1893. The third section is as follows:

"Third. It is mutually agreed that notwithstanding the delivery and acceptance of said lease, the same shall not go into effect nor shall the party of the second part be entitled to enter into possession of the premises and property by said lease demised until the four million dollars ($4,000,000) required by the terms of said lease to be deposited as a guarantee fund shall have been actually deposited either in cash or in securities pursuant to the terms of said lease, with the Brooklyn Trust Company, or companies designated by the parties hereto, nor until a certificate of said Brooklyn Trust Company, or such companies, to that effect is indorsed on or attached to said

lease, which certificate shall be duly executed by said Trust Company or companies under its or their corporate seal, and shall state that said four million dollars ($4,000,000) or such portion thereof as they respectively hold, is held upon the trust and subject to the terms, covenants, stipulations and conditions in said lease contained with respect thereto."

The $4,000,000 guarantee fund required by the lease and referred to in the agreement was deposited on June 6, 1893, and the plaintiff upon that day took possession of the demised property. The work of converting the railroad and extensions composing the leased property into an electric railroad had been commenced by the defendant in July, 1892—more than six months before the execution of the lease— and was continued by defendant after such execution down to the time the plaintiff caused the required deposit to be made and took possession, at a cost and expense to it of $1,481,057.58.

It is the contention of counsel for the defendant that, on the approval of the lease by the stockholders of the respective parties, its provisions became operative and took effect, possession only being deferred; that upon its delivery the lease became valid and obligatory and operated to transfer to the defendant the legal title to the leased property; but that before it should become an operative transfer and possession thereunder be taken, there should be deposited by or for the plaintiff a guaranty fund of $4,000,000; that at the very latest the lease became binding and obligatory upon the parties on its delivery on April 17, 1893; that the time when the money was to be advanced and paid by defendant for conversion purposes is not fixed by the lease; and that the evidence establishes a fixing of such time by parol, as well as an agreement between the parties that the defendant should continue the conversion of the road, prior to possession being taken by plaintiff, and that its expenditure in so doing should be credited upon and applied to the reduction of its contract obligation of $6,000,000. The respondent contends that neither upon the approval of the stockholders or the delivery of the lease did it become operative or go into effect for any purpose whatever; that none of its provisions became operative until the deposit of the guaranty fund on June 6, 1893; that it was not until that time that the contract became final and its provisions obligatory upon the parties; and that the defendant was obligated to thereafter expend the $6,000,000 provided by the lease and cannot have credit for any conversion expenditure made before that time.

The learned referee adopted the contention of the plaintiff, and in so doing we think he is sustained by the evidence. He refused to find, as requested by defendant, that at a consultation between Hollins & Co. and defendant's president on February 16, 1893, "it was agreed that the moneys expended by the defendant in payment of the cost of conversion after February 15, 1893, should be credited to the $6,-000,000 fund provided by the lease to be expended by the defendant in the work of conversion." We think this refusal is supported by the evidence, and we are unable to find, either in the evidence or findings, any facts sustaining the respondent's contention of the making of an oral agreement that the expense of continuing the conversion

of the road by defendant after the execution of the contract and before the deposit of the guaranty fund, and taking possession of the demised property by plaintiff, should be credited to the defendant as a payment upon its contract obligation to expend $6,000,000 in such work; nor do we find any evidence of an oral agreement fixing the time when such expenditure should commence. The lease went into effect on June 6, 1893, and the rights of the parties are governed by its provisions, unaffected by their conversations, consultations, or acts after its execution on February 14th. Even if the parties had the conversations detailed, no one of the persons present and taking part therein was an officer or director of plaintiff, or in any way authorized by its board of directors to make such an agreement on its part or in its behalf. So far as appears, they were wholly without authority or power to obligate the plaintiff by any agreement they might make. The contention that the acts of, and agreements claimed to have been entered into by, Hollins & Co. with the president of the defendant, bound the plaintiff, rests upon the assumption that such firm was the owner, at the time the agreement is said to have been made, of the entire stock of the plaintiff, bringing the case within the rule that, where all of the stockholders of a corporation unite in an agreement within the general scope of its business, the transaction will be upheld as constituting, in practical effect, the act of the corporation, and the party asserting the agreement is not called upon to prove formal action of the board of directors of the corporation authorizing the same. As we have hereinbefore pointed out, the assumption upon which this contention rests, viz., that Hollins & Co. was the owner of all of plaintiff's stock, is not warranted by the evidence or true in fact, for which reason the argument and authorities cited on this branch of the case have no application to the facts presented. It follows that the lease first became operative on June 6, 1893; that the referee's conclusions of law that the defendant was not entitled to deduct from the $6,000,-000 the money expended between the time the lease was executed and the time of its taking effect, and that such expenditure does not constitute a counterclaim in favor of the plaintiff against the defendant, are correct.

[17] The learned referee has awarded interest from September 1, 1894, amounting to $1,616,680.15. Under the common law, interest was not allowed unless the amount of the principal was actually ascertained and liquidated. This rule has been modified; but the extent of the modification is that, if the amount due is capable of being ascertained by mere computation, the allowance of interest is proper. Excelsior Terra Cotta Co. v. Harde, 181 N. Y. 11, 14, 73 N. E. 494, 106 Am. St. Rep. 493. While the respondent concedes the rule so stated to be the law controlling its right to interest, it contends that the evidence establishes, in the case at bar, that the amount due from defendant under the provisions of the lease was capable of ascertainment by mere mathematical computation, and therefore bore interest from the date of its expenditure by the plaintiff, found by the referee to be the 26th of October, 1894. This result, counsel says, "is reached by adding up various columns of figures and taking out various other sums." We cannot agree with this contention.

[18] The judgment is based upon two factors: First, the amount which the defendant failed to expend of the $6,000,000 representing its contract liability; and, second, the amount which on October 26, 1894, the plaintiff had expended upon railroad conversion over and above the amounts advanced by defendant. We think it clearly apparent that the existing account between the parties, and the amount due the plaintiff upon an adjustment thereof, was unliquidated, uncertain, ·and incapable of ascertainment, within the rule cited. In its March, 1900, letter, the plaintiff says, referring to the conversion charges against the $6,000,000 fund, other than the $778,493.38 of "journal entry items," that it had not "the entire information at hand which is necessary for an accurate determination as to the propriety and justice of the charges." It had not acquired and did not possess such information, nor was it able accurately to determine the amount of its expenditures in excess of its reimbursement, and consequently the amount of defendant's indebtedness when it commenced this action, notwithstanding its experts and accountants had long before repeatedly and minutely examined the books and papers of both parties, for it alleged that it had paid out for conversion, for which the defendant was chargeable, over and above its reimbursement, before · September 30, 1894, $2,000,000, for which sum, with interest thereon from said date, it demanded judgment. After a trial lasting eight years, the referee found that it had never paid out the sum of $2,-000,000 for which the defendant was liable, but that such sum and indebtedness was $259,714.62 less than the plaintiff had determined and demanded.

No accounting was ever had between the parties except that evidenced by the tripartite agreement. On April 24, 1903, three years after this action was commenced, and after skilled accountants employed by both parties had thoroughly and exhaustively gone over defendant's books as well as its own, the plaintiff tendered a stipulation to defendant from which it appears that after diligent examination and inquiry by its mathematical experts, assisted by the investigations and efforts of its accountants and attorneys, it had reached the conclusion that the defendant was only entitled to be allowed for its expenditures, made after June 6, 1893, $4,228,881.47, yet the referee found and allowed such net advances at $4,259,741.62. One of the factors producing this result was that, after June 6, 1893, the defendant had paid for many things which had been done before that date, and what the total amount so paid was had to be determined, not by calculation, but by the testimony of witnesses given upon the trial. The stipulation tendered states that, of the amount expended by the defendant after June 6, 1893, $218.528.12 represents "items of materials furnished and labor performed, as to the date of delivery or furnishing of which the plaintiff and defendant differ, and as to these items the plaintiff will offer proof." Another element rendering ascertainment of the amount of defendant's indebtedness to plaintiff impossible by computation, after years of careful and thorough study of the books of the parties by skilled expert accountants, were journal

entries amounting to $673,542.92, as to which the proposed stipulation says:

"Plaintiff denies that any portion thereof is a proper credit on the defendant's obligation to expend the aforesaid sum of $6,000,000."

Yet, after the proofs were taken, the plaintiff was compelled to allow $17,674.15 of the challenged entries as having been expended for conversion done after June 6, 1893. Evidence, not computation, was required to determine what portion of the contested journal entries the defendant was entitled to credit for upon its $6,000,000 obligation, and until such determination the amount of defendant's indebtedness to the plaintiff was not capable of ascertainment. In the stipulation (referring to the items contained in defendant's bill of particulars) the plaintiff claimed that it had expended $46,454.02 for defendant's benefit in the payment of its debts not contracted for construction and conversion of the leased railroad. It was credited on defendant's books with but $41,349.95 expended for such purposes. Evidence was given upon this subject, after which, at plaintiff's instance, the referee found the correct amount to be $42,532.84. Plaintiff's letter of March 2, 1900, written to defendant only four days before the commencement of the action, demanded payment of $778,-583.34, journal entries on defendant's books, not because they represented work done before June 6, 1893, but because they were not proper charges to construction account or "properly chargeable as expenditures of the said" ($6,000,000) "fund." Of those entries $106,432.18 was not attacked or challenged on the trial, and of the remaining items the referee found that $234,377.84 were proper charges.

Without further analysis of the evidence, it is apparent that the ascertainment of what portion of the $6,000,000 fund had not been expended by the defendant for work done after June 6, 1893, upon which depended in part the amount of defendant's indebtedness to plaintiff, was more than a mere matter of computation and not ascertainable thereby. The same is true of the amount and value of the work done by plaintiff in excess of the amounts advanced by defendant. The learned referee first found that $1,740,258.38, over and above expenditures for which plaintiff had been reimbursed by defendant, had been expended by the plaintiff, prior to September 1, 1894. Under no conceivable computation could this conclusion be sustained, and by a supplemental finding the date was changed to October 26, 1894. That the latter date is also erroneous appears from the finding showing the computation producing this amount of indebtedness on the date named, from which there appears to be deducted from the $559,506.70 conceded reimbursements to plaintiff for the expenditures recited in such finding the amount of the $308,340.35 note given to defendant by plaintiff and the Long Island Traction Company, under the provisions of the tripartite agreement, which note was not paid, as the referee finds, until June 25, 1895, eight months after its amount was deducted by the referee from the conceded reimbursements to establish the amount owing by the defendant to plaintiff on October 26, 1894.

Another question not determinable by mere calculation is presented by the collateral trust notes executed by the plaintiff and the Long Island Traction Company and secured by mortgages which were foreclosed, and the property sold in one parcel, and the avails used in payment of the secured indebtedness without, as the agreement of March 24, 1896, says, "any adjustment of the respective proportions of such indebtedness which said two companies may be deemed to have paid." Of this indebtedness, $862,964.75 was claimed by the plaintiff to have been made by its disbursing committee for construction and conversion prior to October 26, 1894.

Without considering the question further, it is clear that the amount of the defendant's indebtedness to plaintiff was not susceptible of determination by computation, at the time it is claimed to have accrued, or at any time thereafter, until the questions stated and referred to and involved in such determination were supported or refuted by evidence and determined by the referee.

The judgment must be modified by deducting therefrom the interest included therein, and as so modified affirmed, without costs to either party in this court. All concur.